65 P.3d 77

**STATE of Arizona, Appellee,**

v.

**Michael Gene BLAKLEY, Appellant.**

**No. CR–00–0360–AP.**

Supreme Court of Arizona,
En Banc.

March 17, 2003.

As Corrected March 27, 2003.

**432**

Janet A. Napolitano, Arizona Attorney General by Kent E. Cattani, Chief Counsel, Capital Litigation Section, Monica B. Klapper, Assistant Attorney General, Phoenix, Attorneys for Appellee.

J. Conrad Baran, Flagstaff, Attorney for Appellant.

## OPINION

ZLAKET, Justice (Retired).

¶ 1 Michael Gene Blakley was convicted of one count of first degree murder and two counts of sexual assault. He was sentenced to death on the murder conviction and to two consecutive life sentences without the possibility of parole for thirty-five years on the remaining counts. An automatic appeal to this court was filed pursuant to Arizona Rule of Criminal Procedure 31.2(b). This court has jurisdiction under Article VI, Section 5(3) of the Arizona Constitution and Arizona Revised Statutes (A.R.S.) sections 13–4031 and –4033 (2001).

## FACTS

¶ 2 The defendant Blakley met Melissa Behunin in April 1998. Less than a week later, he was living with Behunin and her sixteen-month-old daughter, Shelby. After Blakley lost his job at a fast food restaurant, the couple moved to a room at the Arizona Clearwater Hotel in Bullhead City. Behunin started employment at a nearby assisted liv-

ing facility and the defendant began taking care of Shelby while her mother was working.

¶ 3 Around 5:00 a.m. on July 18, 1998, Shelby's crying awakened her mother. The little girl had apparently fallen off the sofa sleeper and suffered a bruise over her left eye. Behunin left for work that day at approximately 12:45 p.m. She testified that before she left, Shelby was acting normally.

¶ 4 At about 4:20 p.m. the defendant called the hotel manager to report that the child was not breathing. He requested that 911 be called, and the manager promptly complied. The 911 dispatcher called the defendant's room and instructed him in CPR. When the paramedics arrived, Shelby was rushed to a local hospital. Because of the severity of her condition, the girl was taken by helicopter to Sunrise Hospital in Las Vegas, Nevada. A few hours after arriving there, she was pronounced dead. Dr. Diane Lipscomb, a pediatric critical care physician, noticed bruising and signs of trauma to the child's vagina and rectum. The medical examiner who later conducted an autopsy testified that Shelby died of anoxic encephalopathy—lack of oxygen to the brain. He found evidence of head trauma, a vaginal abrasion, and a 3/8 inch tear of the rectum. In his opinion, the genital injuries appeared to have been inflicted within the same general time frame as the head injuries. He opined that the child had suffocated, most likely by having her mouth and nose covered.

¶ 5 On July 21, 1998, Blakley and Behunin voluntarily went to the Bullhead City Police Department to be interviewed. Blakley was questioned by two detectives and two Child Protective Services (CPS) investigators. He was read and waived his *Miranda* rights. Initially he stated that after Behunin left for work he washed the dishes and gave Shelby a bath. He then laid down with her on the bed. Several minutes later, he got up for a drink and noticed that she was not breathing.

¶ 6 When the police confronted him with the three hours unaccounted for in his story, Blakley admitted that he had digitally pen-

etrated the victim's rectum and vagina, and had placed his penis in her rectum. He stated that after he did this she was "fussing," and when he laid her down to take a nap she was crying. He said that he placed his hand over her mouth and possibly her nose for five minutes and she quieted down. After the interview, the defendant was placed under arrest.

## TRIAL ISSUES

### A. Motion for Change of Venue/Mistrial

¶ 7 Blakley moved for change of venue based on pretrial publicity. In support, he attached several newspaper articles, along with transcripts of radio stories dealing with his case. Many of these articles referred to him as the "alleged baby-killer." At a hearing on the motion, the defendant seemed most concerned with headlines such as "Judge Accepts Blakley Confession" and "Baby Tried to Fight Off Her Attacker Police Interrogation Transcript Revealed."

¶ 8 The trial court denied the motion, finding that although some of the stories "verge on yellow journalism and were overly inflammatory," a fair and impartial jury could likely be found. It ruled that Blakley had not met his burden under Arizona Rule of Criminal Procedure 10.3(b).[1]

¶ 9 On voir dire, the judge questioned each panel member who had seen or heard anything about the case. Without getting into specific details, the court asked every panelist the source of any such information and whether he or she could be fair and impartial despite knowing something about the case.

¶ 10 In total, seventeen prospective jurors were excused because of their admitted inability to be fair and impartial based on pretrial publicity. Approximately twelve prospective jurors were excused solely because of their adverse reaction to the nature of the charges. Two additional panel members were dismissed. One, a former co-worker of Blakley, stated that he could not be fair.

---

1. "Whenever the grounds for change of place of trial are based on pretrial publicity, the moving party shall be required to prove that the dissemi-

nation of the prejudicial material will probably result in the party being deprived of a fair trial." Ariz. R.Crim. P. 10.3(b).

The other was a CPS worker who had read the CPS file a week before trial. The judge did not ask any questions concerning information contained in the file.

¶ 11 The trial court denied a renewed motion for change of venue and motion for mistrial, ruling that although some jurors had heard about the case, all avowed they could be fair. He noted that those dismissals occasioned by sensitivity to the nature of the case would have occurred in any county because of the particular issues involved.

¶ 12 The defense asked to individually question each juror who had seen news coverage of the case. The judge denied this request, failing to see how additional information would assist the attorneys in making their peremptory challenges. The defense also asked to question prospective jurors who may have spoken to other members of the panel about the case. That request was denied as well.

*1. Motion for Change of Venue*

¶ 13 Blakley argues that his motion for change of venue should have been granted. The state responds that the trial court did not abuse its discretion in denying the motion. We examine this ruling for a clear abuse of discretion and resulting prejudice to the defendant. *State v. Salazar,* 173 Ariz. 399, 406, 844 P.2d 566, 573 (1992). Our task is to determine "whether, under the totality of the circumstances, the publicity attendant to defendant's trial was so pervasive that it caused the proceedings to be fundamentally unfair." *State v. Atwood,* 171 Ariz. 576, 630, 832 P.2d 593, 647 (1992) (citing *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975)).

¶ 14 Prejudice may be presumed if publicity "was so extensive or outrageous that it permeated the proceedings or created a 'carnival-like atmosphere.' " *Atwood,* 171 Ariz. at 631, 832 P.2d at 648. In making this determination a court must review the entire record. *State v. Murray,* 184 Ariz. 9, 26, 906 P.2d 542, 559 (1995); *State v. Bible,* 175 Ariz.

549, 564, 566, 858 P.2d 1152, 1167, 1169 (1993).

¶ 15 The defense provided the trial judge with approximately 33 newspaper articles from Kingman, Mohave Valley, Bullhead City, and Lake Havasu City, as well as transcripts of ten radio clips concerning the case. Although some used inflammatory language, we find no evidence that they significantly affected the proceedings or the atmosphere surrounding the trial. Many of the articles appeared at or near the time of the crime in July 1998 or during the pretrial stages, rather than close to the trial which began in February 2000. Based on the record before us, prejudice cannot be presumed.

¶ 16 Therefore, the defendant has the burden of showing *actual* prejudice. *Murray,* 184 Ariz. at 26, 906 P.2d at 559. He must demonstrate that the jurors "formed preconceived notions concerning the defendant's guilt and that they [were unable to] lay those notions aside." *Id.* (quoting *State v. Chaney,* 141 Ariz. 295, 302, 686 P.2d 1265, 1272 (1984)). We have held, however, that "[p]rior knowledge of a case, by itself, is . . . insufficient to disqualify a juror." *State v. Befford,* 157 Ariz. 37, 39, 754 P.2d 1141, 1143 (1988).

¶ 17 Blakley argues that he was denied a fair trial because he was not allowed to individually question those panelists who were exposed to pretrial publicity. This court has indicated that "[a]n examination of the jurors, through voir dire process, is an effective means by which to determine the effects or influence of pretrial publicity on the jurors." *State v. Greenawalt,* 128 Ariz. 150, 163, 624 P.2d 828, 841 (1981); *see also Salazar,* 173 Ariz. at 406, 844 P.2d at 573 (court conducted individual voir dire of those prospective jurors who had prior knowledge).

¶ 18 Here, the judge questioned each prospective juror and, although it was in the presence of other panelists, he did it in such a manner as to prevent cross-contamination.[2]

---

**2.** The judge asked the panel: "So, if you know or think you know or have read or seen or heard anything about this case from any source whatso-

ever, please raise your hand." Then he asked each juror who had raised a hand:

> Without telling me what it is that you know, can you tell me the source of your informa-

Almost as many people were dismissed because of their stated aversion to the nature of the charges as were excused by virtue of exposure to pretrial publicity. Only three members of the final jury had indicated some knowledge of pretrial publicity. Two had seen a short article a few days before trial; the third remembered an article around the time of the crime and a few articles between then and the time of trial. The defendant has not demonstrated actual prejudice.

¶ 19 We are concerned, however, that counsel were not permitted to conduct individual voir dire of the prospective jurors. *See* Ariz. R.Crim. P. 18.5(d) ("The court shall conduct a thorough oral examination of prospective jurors. Upon the request of any party, the court shall permit that party a reasonable time to conduct a further oral examination of the prospective jurors."). Such questioning often helps to elicit more detailed and candid responses. Its scope, however, is not unlimited. The rule goes on to say "[t]he court may impose reasonable limitations with respect to questions allowed during a party's examination of the prospective jurors, giving due regard to the purpose of such examination. In addition the court may terminate or limit voir dire on grounds of abuse." *Id.*

¶ 20 We believe that Rule 18.5(d) required the trial judge to allow the parties some leeway in exploring each panelist's exposure to pretrial publicity and his or her ability to be fair and impartial. Although the failure to have done so was error, because we are reversing on other grounds it is unnecessary for us to determine whether reversal is required under these circumstances, where the trial judge thoroughly explored the pretrial publicity issue to ensure that the defendant could receive a fair trial and that the parties could "exercise intelligently their peremptory challenges." Ariz. R.Crim. P. 18.5(e). In any event, the defendant failed to show what specific areas of inquiry he would have pursued if permitted, the questions he

intended to ask, and the information he hoped to gain with further interrogation.

### 2. *Mistrial Motion*

¶ 21 The defendant argues that a mistrial should have been granted because of the statements of two prospective jurors during voir dire. Ms. M., a CPS worker, was not asked anything after stating that she had read the CPS file in this case. Mr. P. indicated that he had previously worked with Blakley and had discussed the case with his co-workers. He was not asked anything more. Both were excused. The defendant contends that he should have been allowed to individually voir dire these two, as well as other panelists with whom they may have spoken.

¶ 22 A denial of a mistrial will not be overturned absent an abuse of discretion. *State v. Jones,* 197 Ariz. 290, 304, ¶ 32, 4 P.3d 345, 359 (2000). Both of these prospective jurors were excused for obvious good cause and the judge cut off questioning to avoid cross-contamination. We find no abuse of discretion.

### B. Voluntariness of the Confession

¶ 23 On July 21, 1998, Blakley went voluntarily to the Bullhead City Police Department for questioning. He was given and waived his *Miranda* warnings. The detectives began with background-type questions and then moved into a timeline for the day of the crime. Detective Siebrecht suggested that leniency might be an option, and CPS Investigator Andrews said it would be easier if the defendant told the truth and could get some help, presumably referring to counseling. The interview lasted approximately an hour and a half, during which time Blakley confessed to the crime. His lawyer later filed a motion to suppress the confession. At the ensuing hearing, Blakley presented three witnesses: Dr. Frumpkin, Dr. Cowardin, and Dr. Ofshe.

tion? ... Can you tell me when was the most recent time that you heard or read anything about this case? ... Is there anything about what you either read or heard about this case that caused you to form an opinion concerning the guilt or innocence of the Defendant?

He followed up by asking if, despite what they had heard or seen, they could still be fair and impartial.

¶ 24 Dr. Frumpkin, a forensic psychologist, testified that although Blakley had a learning disability, he possessed the capacity to waive his *Miranda* rights. The doctor also stated that the defendant had difficulty processing verbal information and was highly suggestible. Dr. Cowardin, an educational psychologist, testified that the defendant's ability to process information was that of a normal twelve- or thirteen-year-old child. Dr. Ofshe, a sociologist practicing in the area of social psychology, testified about police interrogations in general, but he was not allowed to state his opinion concerning the reasons Blakley confessed or his probable thought processes during the interrogation. Dr. Ofshe did not and would not render an opinion as to the truthfulness of the confession.

¶ 25 The trial court denied the motion to suppress, stating that it found no direct or implied promises or threats. Moreover, the judge held there was no evidence that the defendant had relied on what was said by his interrogators. Blakley disagrees, arguing that his confession was improperly induced.

¶ 26 The state has the burden of establishing that the confession was voluntary and freely given. *State v. LaGrand*, 153 Ariz. 21, 26, 734 P.2d 563, 568 (1987). A trial court's determination of voluntariness will not be disturbed absent a showing of clear and manifest error. *State v. Lucas*, 146 Ariz. 597, 607, 708 P.2d 81, 91 (1985).

¶ 27 Under the Fifth Amendment to the United States Constitution, confessions may not be obtained by "any direct or implied promises, however slight, nor by the exertion of any improper influence." *Malloy v. Hogan*, 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964); *State v. Thomas*, 148 Ariz. 225, 227, 714 P.2d 395, 397 (1986). Courts must "look to the totality of the circumstances surrounding the confession and decide whether the will of the defendant has been overborne." *State v. Lopez*, 174 Ariz. 131, 137, 847 P.2d 1078, 1084 (1992). In this regard, judges should consider several factors: 1) the environment of the interrogation; 2) whether *Miranda* warnings were given; 3) the duration of the interrogation; and 4) whether there was impermissible police questioning. *State v. Ross*, 180 Ariz. 598, 603, 886 P.2d 1354, 1359 (1994).

A voluntary confession is one not induced by a direct or implied promise, however slight. A confession resulting from a promise is involuntary if (1) police make an express or implied promise and (2) the defendant relies on the promise in confessing. Advice to tell the truth, unaccompanied by either a threat or promise, does not make a confession involuntary.

*Id.* (citations omitted).

¶ 28 Blakley relies on *State v. Thomas*, 148 Ariz. at 226–27, 714 P.2d at 396–97, in which the defendant was told that by confessing to child molestation, he might only serve jail time and receive probation if he attended counseling. The court found Thomas' confession involuntary due to the specific nature of the leniency offered, the defendant's persistent assertions of innocence, and his immediate recantation of the confession. *Id.* at 227, 714 P.2d at 397. In the present case, however, there was no specific mention of a "deal" if Blakley confessed, and the detectives expressly stated that they could not make him any promises. We also must not forget the atmosphere in which Blakley's statements were made. He voluntarily came to the police station, *Miranda* warnings were properly given, and the entire interview lasted a relatively short period of time.

¶ 29 Mere advice that it would be better to be truthful is a permissible interrogation tactic. *State v. Amaya–Ruiz*, 166 Ariz. 152, 165, 800 P.2d 1260, 1273 (1990). In *State v. Lacy*, 187 Ariz. 340, 347, 929 P.2d 1288, 1295 (1996), a statement by an officer that he could not promise the defendant anything was sufficient to qualify previous suggestions that a deal might be reached.

¶ 30 The most worrisome part of this interview was Detective Siebrecht's suggestion that the county attorney might be notified of Blakley's uncooperative behavior. Siebrecht asked: "Why wouldn't they slam you to the wall if you make us work harder on this than we have to?" The Ninth Circuit has stated:

Although it is permissible for an interrogating officer to represent, under some

circumstances, that the fact that the defendant cooperates will be communicated to the proper authorities, the same cannot be said of a representation that a defendant's failure to cooperate will be communicated to a prosecutor. Refusal to cooperate is every defendant's right under the fifth amendment. Under our adversary system of criminal justice, a defendant may not be made to suffer for his silence. Because there is no legitimate purpose for the statement that failure to cooperate will be reported and because its only apparent objective is to coerce, we disapprove the making of such representations.

*United States v. Tingle,* 658 F.2d 1332, 1336 n. 5 (9th Cir.1981). Like the Ninth Circuit, we do not approve of such a tactic. In the context of the entire interview, however, we cannot say that the suggestion by Detective Siebrecht justified suppression.

¶ 31 Although Blakley contends that his young intellectual age and cognitive difficulties made his will easy to overcome, such characteristics are generally not relevant to a determination of voluntariness unless the police knew or should have known about them. *State v. Carrillo,* 156 Ariz. 125, 135–37, 750 P.2d 883, 893–95 (1988) (citing *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). There is no evidence of such knowledge here.

¶ 32 Moreover, even if we were to find that Detective Siebrecht's question constituted a promise or implied threat, there is no evidence that the defendant relied on it or confessed because of it. Although the interrogator's tactics were close to the line, we cannot say the trial judge was clearly and manifestly wrong in holding that the defendant's statements were voluntary.

## C. Dr. Ofshe's Testimony at the Voluntariness Hearing

¶ 33 At the voluntariness hearing, defense counsel asked Dr. Ofshe: "Was there a particular tactic utilized during the July 21st, '98 interrogation of Mr. Blakley that was motivated to shift from denial to admission?" Dr. Ofshe answered "yes," and the state objected because the testimony would

go to the ultimate fact for decision. The court ruled:

I will allow you to elicit from him observations about police tactics but to the extent that you are asking him to express—to express an opinion that these tactics on this specific occasion caused the defendant to react and do something, that's not something I will allow him to testify to so you can rephrase your question if you want.

Defense counsel then went through the interrogation and the witness commented on the tactics that were used in Blakley's questioning. Later in his testimony, Dr. Ofshe attempted to relate what the defendant had told him about his motivation to confess. The state objected on hearsay grounds, and the objection was sustained. On cross-examination, the state tried to elicit an opinion about Blakley's ability to answer questions during the interrogation, and a defense objection was sustained.

¶ 34 Blakley argues that expert testimony about his will being overborne and the coercive nature of the confession should have been allowed to "provide information that is not within the common knowledge of the common juror, or, in the case of the suppression hearing, the judge." The standard of review for evidentiary rulings is abuse of discretion. *State v. Rodriguez,* 186 Ariz. 240, 250, 921 P.2d 643, 653 (1996).

¶ 35 "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Ariz. R. Evid. 704. Some opinions on ultimate issues, however, may be rejected if they would not assist the trier of fact to understand the evidence or determine a fact in issue. *See* Ariz. R. Evid. 704, cmt.

¶ 36 In *State v. Lindsey,* a case dealing with expert testimony concerning the credibility of a particular witness, we said:

Thus, even where expert testimony on behavioral characteristics that affect credibility or accuracy of observation is allowed, experts should not be allowed to give their opinion of the accuracy, reliability or credibility of a particular witness in the case being tried. Nor should such experts be allowed to give opinions with respect to the

accuracy, reliability or truthfulness of witnesses of the type under consideration. Nor should experts be allowed to give similar opinion testimony, such as their belief of guilt or innocence. The law does not permit expert testimony on how the jury should decide the case.

149 Ariz. 472, 475, 720 P.2d 73, 76 (1986) (citations omitted).

¶ 37 We fail to see how the trial judge's ruling here constituted an abuse of discretion. Dr. Ofshe provided general information about police interrogation methods. He then went step by step through Blakley's confession, pointing out what he viewed as coercive tactics. The witness testified that, in his opinion, the police made promises and threatened Blakley. He was only prevented from rendering a final opinion as to whether the confession was voluntary. Two other experts supplied insight into the unique mental and psychological make-up of the defendant that might have been instructive and useful to the judge. The ultimate conclusion offered by Dr. Ofshe was of little or no additional value.

¶ 38 Whether Arizona Rule of Evidence 703 would allow Dr. Ofshe to testify concerning Blakley's statements to him was not preserved as an issue in the trial court and is therefore waived. *State v. Brita*, 158 Ariz. 121, 124, 761 P.2d 1025, 1028 (1988) (stating that it is improper for an appellate court to consider an issue for the first time on appeal). Furthermore, although Blakley's statements may have been admissible under a hearsay exception, such as state of mind, that issue has also been waived. Thus, we conclude that exclusion of Dr. Ofshe's testimony regarding the ultimate issue, as well as Blakley's statements to him, was not an abuse of discretion.

### D. Dr. Ofshe's Trial Testimony

¶ 39 Blakley contends that Dr. Ofshe should have been allowed to testify at trial that the confession was involuntary and coerced. For reasons similar to those set forth above, we find that the trial court did not abuse its discretion in excluding these opinions. Dr. Ofshe provided the jury with ample evidence concerning the tactics used by the police. He was allowed to testify that portions of the interrogation transcript demonstrated coercive tactics and offers of leniency.

¶ 40 On cross-examination at trial, the state asked Dr. Ofshe about his questioning of Blakley. For example, the prosecutor inquired: "Did you ask him about any mental condition he might have?" and "Did you ask him about any counseling he had in the past?"

¶ 41 Blakley contends that the state thereby "opened the door" to testimony concerning his statements to Dr. Ofshe. As the trial court noted, however, the prosecutor merely asked the doctor about the areas and types of questions he had propounded to the defendant. The state did not inquire into the defendant's answers, so the "door" was never really opened. Moreover, the defense never presented the trial court with a legal basis for admitting Blakley's statements about his *own mental condition at the time of the crime*. Thus, the issue was waived.

### E. Child Abuse Added as Predicate Felony

¶ 42 The indictment alleged that the defendant "committed murder in the first degree ... in violation of A.R.S. §§ 13–1105, 13–1101, 13–604.01, 13–703, 13–701 and 13–801, a Class 1 Felony." The state announced before voir dire that it would be pursuing only a felony murder theory. In opening statement, the prosecutor said the state had to prove that Blakley committed a sexual assault, and that in the course and in furtherance thereof he killed Shelby. The defense theory was that Shelby's death was not caused by suffocation but rather by blunt force head trauma. Blakley also argued that the child's death was not "in the course or furtherance of" the sexual assaults.

¶ 43 Dr. Robert Bucklin, the Nevada medical examiner who conducted the autopsy, testified that Shelby had subarachnoid hemorrhages, bleeding of the filmy layer that covers the brain. He said that such hemorrhages may be present in cases of shaking or rapid head movement, but are generally not seen with blunt force trauma. He also

observed hemorrhages on the anterior and posterior scalp which did not reach the bone and may have been caused by rapid head movement or something striking the head. Finally, he testified that her genital injuries were recent.

¶ 44 Dr. Flores, a pathologist called by the defense, testified that in his opinion, the cause of death was more likely blunt force head trauma. He agreed that the genital injuries occurred recently but he was unable to determine how close to the time of death.

¶ 45 At the end of the state's case, Blakley moved for a directed verdict on the felony murder count, arguing that the state had failed to prove any connection between the sexual assaults and the murder. The court denied the motion, stating that

> the jury could reasonably assume that they were taking place during an event that would be most likely causing this child to be crying and screaming and that it is less likely that she would have been quiet during this incident and then some time later would have started acting this way....

¶ 46 At the close of all the evidence and prior to final arguments, the parties and the court discussed proposed jury instructions. The state requested instructions concerning sexual assault *and child abuse* as predicate felonies. The appellant objected, citing the indictment which did not mention child abuse, and lack of prior notice. The court stated: "I am simply not convinced that there is any authority for your suggestion that the State had an obligation to disclose in advance any specific predicate felony that he wants to allege in this case."

¶ 47 The United States Supreme Court has stated:

> No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal.

*Cole v. Arkansas,* 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948). Rule 13.2 of the Arizona Rules of Criminal Procedure states that an "indictment or information shall be a plain, concise statement of the facts sufficiently definite to inform the defendant of the offense charged." Ariz. R.Crim. P. 13.2.

¶ 48 According to the state, this court has consistently held that "[t]here is no requirement that the defendant receive notice of how the State will prove his responsibility for the alleged offense." *State v. Arnett,* 158 Ariz. 15, 18, 760 P.2d 1064, 1067 (1988) (citing *State v. Tison,* 129 Ariz. 526, 538, 633 P.2d 335, 347 (1981)). In *State v. West,* 176 Ariz. 432, 443, 862 P.2d 192, 203 (1993), *overruled on other grounds by State v. Rodriguez,* 192 Ariz. 58, 64 n. 7, 961 P.2d 1006, 1012 n. 7 (1998), we rejected the defendant's claim that reversal was required because the prosecutor "misled him into believing that the state would proceed on a premeditated theory *as well as* on a felony murder theory." The court held that "[t]he prosecutor has no independent duty to tell the defendant how the state intends to proceed or to elect theories in advance." *Id.* (citing *Arnett,* 158 Ariz. at 18, 760 P.2d at 1067).

¶ 49 In *State v. Gray,* 122 Ariz. 445, 447–48, 595 P.2d 990, 992–93 (1979), we held that due process was not denied where a defendant was convicted of second degree statutory rape when charged with first degree rape but put on notice of the victim's minority. There the victim had testified at the preliminary hearing that she was seventeen years old. Justice Gordon dissented, stating that "different defenses are involved, and a defendant may virtually convict himself of statutory rape if he is surprised by a statutory rape instruction after presenting a consent defense to a forcible rape charge." *Id.* at 450, 595 P.2d at 995 (Gordon, J., dissenting).

¶ 50 In *State v. Arnett,* the court distinguished the defendant's situation from one in which an accused suffers surprise or lack of time for trial preparation because of a failure to specify the murder theory. In that case, felony murder and the predicate felony were mentioned on the first day of trial. The court found that this was adequate notice, giving defense counsel a reasonable chance to rebut the allegation. *Arnett,* 158 Ariz. at 18, 760 P.2d at 1067.

¶ 51 *State v. Hutton,* 143 Ariz. 386, 694 P.2d 216 (1985), involved lesser-included offenses of first degree murder. The defendant claimed error because he believed the state was pursuing a first degree murder charge. He allegedly failed to defend against the possibility of a manslaughter charge. Clearly, however, a defendant is on notice of lesser-included offenses from the time of indictment. *Id.* at 390, 694 P.2d at 220. An altogether different predicate felony is quite distinct from a lesser-included offense.

¶ 52 In *State v. Eastlack,* 180 Ariz. 243, 883 P.2d 999 (1994), the defendant complained of inadequate notice that kidnapping would be used as a predicate felony. This court summarily rejected the argument, stating "[d]efendant is entitled to notice of the crimes with which he may be convicted, not the manner in which the state will prove his guilt." *Id.* at 258, 883 P.2d at 1014. It should also be noted that Eastlack failed to demonstrate prejudice or unfair surprise.

¶ 53 We believe the foregoing cases are distinguishable from that presently under consideration. Blakley was aware at the time of trial that the state was proceeding on a felony murder theory. However, nothing in the proceedings up to the eve of *closing arguments* gave him notice that the predicate felony would be child abuse. He had been indicted on two counts of sexual assault. The grand jury was never instructed on any predicate felony *other than sexual assault.* The prosecutor stated in his opening statement at trial that the murder was committed in the course of or in furtherance of the crime of sexual assault.

¶ 54 Blakley's entire defense rested on the reasonable assumption that sexual assault was the sole predicate felony. At oral argument before us, his counsel pointed specifically to other evidence that would have been elicited at trial had the defense known child abuse would be used as a predicate felony. The record supports the assertion that a different theory of defense would likely have been advanced had child abuse been disclosed earlier in these proceedings. As it is, the defendant was induced to convict himself by arguing that the victim died of head trauma, not the sexual assault. That, of course, played right into the undisclosed child abuse allegation.

¶ 55 The insertion of a new predicate felony after all the evidence was in and the defense had rested constitutes reversible error. The prejudice caused by such late notice was obvious. The defendant was deprived of his constitutional right to a fair trial.

¶ 56 Moreover, the state has failed to show how or why it would be unduly burdensome to require disclosure of a predicate felony early in the proceedings. In order to avoid injustice and to ensure that proper notice has been given in a felony murder case, we believe the state should include the predicate felony in the original or an amended indictment.

¶ 57 In *Sheppard v. Rees,* 909 F.2d 1234 (9th Cir.1989), the defendant was charged with one count of murder involving the use of a firearm. The prosecutor proceeded at trial on a theory of premeditated murder. At no time during the pretrial proceedings, opening statements, or trial testimony was there any mention of felony murder, either explicitly or impliedly. After both sides had rested, jury instructions were settled. Closing arguments were scheduled for the next day. The following morning, the prosecutor requested a felony murder instruction with robbery as the predicate felony. *Id.* at 1235. The judge instructed the jury on felony murder and the prosecutor argued it in his closing statement. *Id.* at 1236. The appellate court later stated:

> The constitutional error in the instant case was of [ ] a fundamental nature.... Here, the prosecutor "ambushed" the defense with a new theory of culpability after the evidence was already in, after both sides had rested, and after the jury instructions were settled. This new theory then appeared in the form of unexpected jury instructions permitting the jury to convict on a theory that was neither subject to adversarial testing, nor defined in advance of the proceeding.

*Id.* at 1237. The court held that the right to counsel was implicated because the lack of notice denied the defendant a right "to re-

spond to charges against which he or she must defend." *Id.*

¶ 58 We agree with the following observation of the Ninth Circuit: "We cannot regard as fair a trial in which the defendant's right to defend was impaired by a lack of notice as to the nature and cause of the accusation. Under these circumstances, lack of constitutionally required notice necessarily denies a defendant the fundamental right to a fair trial." *Id.* at 1238. We therefore reverse the capital conviction and sentence.

### F. Motion to Dismiss for Timeliness

¶ 59 On January 19, 2000, Blakley filed a motion to dismiss for a violation of Arizona Rules of Criminal Procedure, Rule 8.2(b) setting forth time constraints as to when a defendant shall be brought to trial. Rule 8.2(b) states:

> Every person held in custody in this state on a criminal charge shall be tried by the court having jurisdiction of the offense within 120 days from the date of the person's initial appearance ... or within 90 days from the date of the person's arraignment before the trial court, whichever is the lesser.

A hearing was held on February 1. The court calculated the elapsed time as only 63 days from arraignment until the February 8 trial date and denied the motion.

¶ 60 The defendant argues that the time periods between July 21, 1998 and September 21, 1998, and between September 1, 1999 and December 6, 1999, were not excludable under Rule 8.4. The state contends that Blakley should have filed a special action earlier and, therefore, that this court should not reach the merits.

¶ 61 In *Stone v. Wren,* 22 Ariz.App. 165, 525 P.2d 296 (1974), a special action petition was brought to review denial of a motion to dismiss for violation of the right to a speedy trial. Nothing in that case, however, *requires* that such an issue be brought on a special action petition rather than on direct appeal. In *State v. Schaaf,* 169 Ariz. 323, 327–28, 819 P.2d 909, 913–14 (1991), a direct appeal of a capital case, this court properly analyzed the defendant's claimed violations of Rule 8.

¶ 62 Blakley was arraigned on August 10, 1998, and his first trial date was September 21, 1998. This is includable time. September 21, 1998 through September 20, 1999 was time excluded because of defendant's motions to continue and pretrial motions. On September 20, 1999, a status conference was held to determine a firm trial date. Defense counsel requested and obtained a date in December. Therefore, the time from September 20, 1999 to December 7, 1999 was excludable. The state then moved to continue trial for twenty-one days from December 7, 1999. That time was includable. However, because the defense said it could not secure witnesses, trial was continued until February 8, 2000. We agree with the trial court that the total time for Rule 8 purposes was 63 days. Therefore, Rule 8 was not violated and the motion to dismiss was properly denied.

### G. Third–Party Culpability Evidence Excluded

¶ 63 A defendant may present evidence that a third party committed the crime for which he is charged. *State v. Tankersley,* 191 Ariz. 359, 369 ¶ 38, 956 P.2d 486, 496 (1998). The state moved *in limine* to exclude the following evidence relating to Fred Blakley, the defendant's cousin: 1) when Fred was thirteen to fifteen years old, he repeatedly molested Keri Williams, his six-or seven-year-old female cousin, for which he was adjudicated delinquent in juvenile court; 2) Fred had telephoned Keri in 1999 and yelled at her; 3) Fred had a fight with Keri's brother; 4) Fred had a history of cruelty to animals; 5) after a newspaper article indicated that a cousin of the defendant may have caused Shelby's death, Keri began receiving hang-up phone calls; 6) Fred had been molested as a young boy; 7) Fred was beaten by his father; 8) Fred's father died of AIDS; and 9) Fred had engaged in self-mutilation.

¶ 64 Blakley did not file a written response to this motion. At argument in the trial court, he conceded that the evidence referred to in numbers 3 and 8 above was irrelevant and inadmissible. The judge determined that

there was no "reasonable basis to infer that Frederick Blakley had a character trait giving rise to an aberrant sexual propensity to commit the crime charged against Shelby." *See* Ariz. R. Evid. 404(c)(1)(B). He went on to find that the evidence was excludable. *See* Ariz. R. Evid. 403.

¶ 65 The state contends that the ruling was correct because 1) the court did not keep out all evidence pertaining to Fred Blakley-only that relating to his history of aberrant sexual behavior and cruelty to animals; and 2) even if all evidence had been excluded, the ruling would have been proper under *State v. Fulminante,* 161 Ariz. 237, 778 P.2d 602 (1988).

¶ 66 Blakley argues that the evidence in question was admissible under Rule 404(c), which states:

> In a criminal case in which a defendant is charged with having committed a sexual offense, . . . evidence of other crimes, wrongs, or acts may be admitted by the court if relevant to show that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the offense charged.

Ariz. R. Evid. 404(c).

¶ 67 Without deciding whether Rule 404(c) applies to someone other than a defendant, we find that the evidence was properly excluded. Recently, in *State v. Gibson,* 202 Ariz. 321, 44 P.3d 1001 (2002), we clarified the appropriate standard to be applied in determining admissibility of third-party culpability evidence. That standard is as set forth in Arizona Rules of Evidence 401, 402, and 403.

¶ 68 Here, exclusion of the evidence concerning Fred Blakley was not an abuse of discretion. Blakley never attempted to show that Fred was present at the crime scene on the day of the murder.[3] The molestation committed by Fred was not similar to the sexual assault committed upon Shelby, and we fail to see how telephone calls between Fred and his previous victim around the time of Blakley's arrest were relevant.

---

**3.** Blakley asserts that there was evidence Fred was planning to come to the motel room on the

**DISPOSITION**

¶ 69 Finding error as described in this opinion, we reverse Blakley's first degree murder conviction and sentence. The matter is remanded to the trial court for proceedings not inconsistent with this opinion. We affirm Blakley's sexual assault convictions and sentences.

CONCURRING: CHARLES E. JONES, Chief Justice, RUTH V. McGREGOR, Vice Chief Justice, STANLEY G. FELDMAN, Justice (Retired), and REBECCA WHITE BERCH, Justice.

---

day Shelby died. However, the record does not support this assertion.