NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

AGUSTIN NAVARRO, *Appellant.*

No. 1 CA-CR 22-0084
FILED 8-29-2023

Appeal from the Superior Court in Maricopa County
No.  CR2018-122824-001
The Honorable Jennifer E. Green, Judge
The Honorable Michael W. Kemp, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Brian R. Coffman
*Counsel for Appellee*

Grand Canyon Law Group LLC, Mesa
By Angela C. Poliquin, David P. Lish
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Daniel J. Kiley delivered the decision of the Court, in which Vice Chief Judge Randall M. Howe and Judge Jennifer M. Perkins joined.

---

**K I L E Y**, Judge:

¶1         Agustin Navarro appeals his convictions and sentences for sexual assault, kidnapping, sexual abuse, second-degree escape, and third-degree burglary. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2         Navarro and the victim, "Amy" (a pseudonym), began working together in 2015 at a furniture and appliance store in Phoenix. Amy was an operations manager and Navarro's supervisor.

¶3         Viewed in the requisite light most favorable to sustaining the verdicts, *State v. Harm*, 236 Ariz. 402, 404, ¶ 2 n.2 (App. 2015), the trial evidence shows that Navarro developed an intense "crush" on Amy, extending what she later described as "extremely persistent" invitations to spend time together outside of work. Though Navarro's repeated overtures made her uncomfortable, Amy treated him cordially in an effort to maintain a harmonious working relationship.

¶4         In early May 2018, Navarro texted Amy to "invite[] [her] to go ice skating." Amy did not respond to Navarro's text. When they were working together on May 7, Navarro asked Amy on a date. She gave a noncommittal response that he interpreted as a rejection.

¶5         When Amy arrived to open the store the following morning, she noticed Navarro's car in the parking lot. Finding it odd that Navarro arrived so unexpectedly early, and sensing "something wasn't right," Amy waited to enter the store until after another employee arrived. When Amy entered the store, Navarro began asking a number of "very specific questions" about which other employees were scheduled to work that morning and what time they would be arriving.

¶6         Amy initially set up some displays in the store's showroom, then went to the warehouse area in the back with Navarro to break down boxes. When she momentarily turned her back on him, Navarro suddenly

grabbed her around the neck and began choking her. When she fought back, Navarro pulled her down, squeezed her around the neck, "head-butted" her, and rammed her head against the floor until she went limp.

¶7        Navarro then dragged Amy out the back door onto the loading dock behind the store. When Amy stirred as she began to regain consciousness, Navarro strangled and hit her until she again passed out. Meanwhile, a motorist who was driving behind the store called 9-1-1 to report that he had seen a man dragging and punching a person lying on the ground.

¶8        Navarro took a key from Amy's pocket, unlocked the door to an outside electrical room, and dragged her inside. This room did not have security cameras and could not be accessed by the public or non-managerial employees.

¶9        Once inside the room, Navarro choked Amy and kicked her in the head. Navarro then removed his clothing and hers, tearing off Amy's bra, undershirt, and menstrual pad. Navarro touched her breasts, buttocks, and genitals, penetrating her genitals with his fingers and penis. Struggling to maintain an erection, Navarro began watching pornography on his phone.

¶10       Meanwhile, police officers responded to the 9-1-1 call and spoke with another manager, who led the officers to the warehouse at the back of the store. They did not see anyone there but observed a broken necklace and liquid that appeared to be urine on the floor. The manager then showed the officers the store's security video, and they saw Navarro attacking Amy and dragging her out the back of the store.

¶11       While in the electrical room, Navarro heard people calling Amy's name and noticed that her Apple watch had lit up, indicating an incoming call or message. He got dressed and walked around to the front of the store, entering through the front door. Navarro, who was disheveled and looked like "he'd been in a fight," claimed that he and Amy had been set upon by unknown assailants who kidnapped Amy and took her away. An officer immediately detained and handcuffed Navarro.

¶12       Meanwhile, the manager led other officers out the back and opened the door to the electrical room. They found Amy lying on the floor naked, unresponsive, and bleeding from the anus. They found her menstrual pad and clothing, including her torn bra and undershirt. Paramedics arrived at the scene and transported her to the hospital. When she arrived at the hospital, she was suffering respiratory failure and

3

significant brain trauma. Physicians placed her on a ventilator and surgically repaired deep lacerations to her face and tongue. Once lucid, Amy wrote a note reading, "I thought he was my friend." Though she was able to describe the events leading up to and immediately after the attack, she was unable to remember the attack itself.

¶13        A forensic nurse examined Amy, documenting numerous injuries to her head, neck, arms, legs, buttocks, anus, and perineum. Injuries to her head and neck were consistent with strangulation. The nurse took swabs of Amy and Navarro for DNA testing. Forensic scientists later found Amy's DNA profile on swabs of Navarro's right and left fingernails, left finger and palm, and the tip and shaft of his penis. They also found the presence of male DNA on swabs of Amy's right breast.

¶14        Outside the store, Navarro, while handcuffed, attempted to run, causing the officers to lay him flat on the ground so he could not flee. Later, as Officer Corrales was helping Navarro get out of his patrol car at the police station, Navarro kicked the officer near the groin. Officer Corrales managed to restrain Navarro and took him to an interview room, where Detective Bartlett later interviewed him. After being read his *Miranda*[1] rights and agreeing to answer Detective Bartlett's questions, Navarro admitted that he arrived at the store that morning intending to incapacitate and sexually assault Amy because she had rejected his advances. He admitted that he removed Amy's clothing and menstrual pad, touched her breasts and genitals, and attempted to penetrate her vaginally with his penis, but claimed he was unable to do so because he could not maintain an erection. Navarro also admitted that he kicked Officer Corrales in an attempt to flee. During the interview, Navarro complained of discomfort on the foreskin of his penis, which appeared purple and swollen.

¶15        Police searched Navarro's phone pursuant to a warrant and learned that pornographic videos had been viewed beginning at 11:51 a.m., during Navarro's assault on Amy. The police also discovered that, in the days leading up to the assault, the phone had been used for online searches for the location of ice skating rinks and with queries such as (1) "how to kiss a girl," (2) "how to know if someone has blocked your number," and (3) "at what temperature does sperm die."

¶16        The State charged Navarro with one count each of attempted first-degree murder, a class 2 felony; kidnapping, a class 2 felony; sexual abuse, a class 5 felony; second-degree escape, a class 5 felony; third-degree

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

4

burglary, a class 4 felony; resisting arrest, a class 6 felony; and three counts of sexual assault, all class 2 felonies.[2] The sexual assault offenses, respectively, involved digital-vaginal, penile-vaginal, and penile-anal penetration.

**¶17**        Before trial, Navarro moved to suppress his statements to officers, arguing that his confession had been involuntary and violated the corpus delicti doctrine. After an evidentiary hearing, the superior court denied the motion to suppress, finding that Navarro voluntarily answered Detective Bartlett's questions. The court also rejected Navarro's corpus delicti claim, finding sufficient independent evidence corroborating Navarro's inculpatory statements, including the store's security video, Amy's testimony and injuries, DNA evidence, and cell phone evidence.

**¶18**        During the 14-day jury trial, Navarro moved for a judgment of acquittal under Arizona Rule of Criminal Procedure ("Rule") 20(a)(1). The superior court denied the motion as to all but resisting arrest and submitted the case to the jury. The jury acquitted Navarro of attempted first-degree murder and sexual assault involving penile-anal penetration but convicted him of the remaining charges. The jury went on to find aggravating factors for the sexual assault, sexual abuse, and kidnapping convictions. The court imposed consecutive sentences for each of Navarro's convictions, sentencing him to a total of 37 years' imprisonment. Navarro timely appealed. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## DISCUSSION

### I.    Voluntariness.

**¶19**        Navarro argues that the superior court erred by denying the motion to suppress his statements to officers because his autism diagnosis constituted an intellectual disability, rendering his confession involuntary. We review the factual findings underlying the superior court's ruling on a voluntariness motion for abuse of discretion but review the court's legal conclusions *de novo*. *See State v. Newell*, 212 Ariz. 389, 397, ¶ 27 (2006). Our review is limited to the evidence presented at the voluntariness hearing. *See State v. Moore*, 222 Ariz. 1, 7, ¶ 17 (2009) ("A trial court ruling on a motion

---

[2] The State charged Navarro with an additional count of aggravated assault on a law enforcement officer, a class 6 felony, but the State later dismissed that charge after the victim officer was unable to attend the trial to testify.

to suppress is reviewed based solely on the evidence presented at the suppression hearing.").

**¶20** A defendant's statements during custodial interrogation are presumptively involuntary. *See State v. Greenberg*, 236 Ariz. 592, 597, ¶ 21 (App. 2015). When a defendant moves to suppress such statements, the State bears the burden of establishing by a preponderance of the evidence that they were freely and voluntarily made. *State v. Tapia*, 159 Ariz. 284, 287 (1988). To be voluntary, and thus admissible, "a statement must . . . not [be] obtained by coercion or improper inducement." *State v. Bush*, 244 Ariz. 575, 588, ¶ 49 (2018). When a defendant has "mental disabilities," "the test for voluntariness . . . is whether the condition renders him unable to understand the meaning of his statement." *State v. Bravo*, 158 Ariz. 364, 371 (1988).

**¶21** Although Navarro mentioned toward the end of his interview that he "was diagnosed with autism" when he was in "elementary school," he neither argued nor presented evidence of an intellectual disability at the voluntariness hearing. We therefore review for fundamental error his claim on appeal that his mental state rendered him unable to knowingly, voluntarily, and intentionally waive his right to remain silent. *See Newell*, 212 Ariz. at 398, ¶ 34. "Fundamental error is error going to the foundation of the case, error that takes from the defendant a right essential to his defense, [or] error of such magnitude that the defendant could not possibly have received a fair trial." *Id.* (cleaned up).

**¶22** After considering the evidence presented at the voluntariness hearing, the superior court found that "[t]he detective read [Navarro] his *Miranda* rights" and that Navarro did not invoke his rights to counsel or to remain silent. Instead, Navarro answered the detective's questions, and "nothing about his responses . . . suggested . . . that he did not understand the nature of what was occurring, that he was in distress, or that he was forced or coerced somehow into answering questions." Moreover, the court found, Navarro "did not ask for," or "appear to need," medical treatment. "Based on the totality of the circumstances," the court concluded, Navarro's "statements were voluntary."

**¶23** Evidence in the record amply supports these findings. Although Navarro asserts that, after the officers took him to the ground during the arrest, one of the officers "expressed indifference" when he complained that the hot pavement was "burn[ing]" him, these assertions do not establish the involuntariness of his statements during his subsequent interview. The interview was conducted several hours later by Detective

Bartlett, an officer who was not present at the arrest scene, at a location different from the arrest scene, *i.e.*, an interview room at the police station. The passage of time, the change in location, and the fact that the interview was conducted by a different officer supports the superior court's finding that "the struggle on the ground at the crime scene had no discernible impact on the detective's interview of [Navarro] hours later at the police station." *See State v. Strayhand*, 184 Ariz. 571, 581 (App. 1995) ("[W]hether there was any change in the place of interrogation" or "change in the identity of the interrogators" are factors that may be considered in "determin[ing] whether coercive pressures have been dispelled.").

¶24         At the voluntariness hearing, Detective Bartlett testified that he began his interview of Navarro by giving him some water. *See State v. Lundstrom*, 157 Ariz. 485, 488 (App. 1988) (noting that accommodation of interviewee's physical needs supports finding of voluntariness), *vacated in part on other grounds by State v. Lundstrom*, 161 Ariz. 141 (1989). The detective then read *Miranda* warnings, and Navarro acknowledged that he understood his rights and agreed to answer questions. The detective testified that Navarro did not appear to be in distress. Navarro's hands were not cuffed together while he was being questioned; instead, one hand was free while the other was cuffed to the table in a "comfortable position." The video recording of the interview shows that the detective maintained a calm and low-key demeanor throughout. He did not raise his voice, and he asked largely open-ended and non-repetitive questions. *See State v. Hatfield*, 173 Ariz. 124, 126 (App. 1992) (identifying factors courts may consider in determining voluntariness, including "whether or not the accused was advised of his or her constitutional rights" and whether the questioning was "repeated and prolonged"). Indeed, early on during the interview, Navarro commented that the detective was nice, and at the conclusion of the interview, Navarro stated that he "would like to thank" the detective "for everything" he had "done for [him]." To the extent that the detective used "good cop" interrogation techniques to gain Navarro's trust, the use of "psychological tactics to elicit statements from a suspect," by itself, does not render a confession involuntary. *See id.*

¶25         Navarro's statements make clear that he understood the gravity of the situation; before the detective asked any substantive questions, Navarro asked, "Am I going to prison right afterwards, or how does this work?" The detective replied, "That's not up to me," and then began asking questions. Navarro gave coherent and responsive answers to the questions, offering details about the attack and explaining his motives. Moreover, although Navarro admitted that he choked Amy to "incapacitate her" because he "wanted to rape her," and further admitted touching "her

butt cheeks, her vagina, and her breasts," he denied penile or digital penetration. When the detective asked about lacerations to Amy's anus, Navarro insisted that any injuries to her anus were "unintentional." When the detective later stated that his review of the security video led him to conclude that Navarro "intended to kill" Amy, Navarro denied it, maintaining, "I did not want to kill her. I just wanted her to be incapacitated." Navarro's self-serving responses to some of the detective's questions refute his contention on appeal that he was cowed into a state of meek submission or that his will was otherwise overborne. *See State v. Amaya-Ruiz*, 166 Ariz. 152, 165 (1990) (observing that defendant's "steadfast[] deni[al]" during police questioning that he committed one of the alleged offenses "indicates that [his] will was not overborne").

**¶26** Navarro did not mention his autism diagnosis until the end of the interview, after he had answered Detective Bartlett's questions about the events of that day. Nothing in the record suggests that the detective knew or should have known of Navarro's diagnosis before Navarro belatedly mentioned it, and so Navarro's diagnosis has no bearing on the voluntariness of his prior statements. *See State v. Blakley*, 204 Ariz. 429, 437, ¶ 31 (2003) (stating that a defendant's "cognitive difficulties" and intellectual immaturity "are generally not relevant to a determination of voluntariness unless the police knew or should have known about them").

**¶27** Although Navarro stated during the interview that his penis "kind of hurts right now" because "the head or the glans of [his] penis is purple because the foreskin is wrapped around it," physical discomfort alone does not render a confession involuntary. *See State v. Arnett*, 119 Ariz. 38, 42-43 (1978) ("[E]vidence of nothing more than uncomfortable surroundings and slight health problems" will not establish that an arrestee's "free will" has been "overborne."). The video recording of the interview shows that Navarro did not request medical attention or seem troubled by pain, and so supports the court's finding that Navarro did not appear to be "in distress" or "to need medical assistance" during the interview. The superior court did not err in determining that the State met its burden of establishing the voluntariness of Navarro's statements during his post-arrest interview.

## II. Sufficiency of the Evidence and Corpus Delicti.

**¶28** Navarro contends that the superior court erred in denying his motion for judgment of acquittal, arguing that the State failed to present sufficient evidence of sexual assault and sexual abuse and that his convictions rest solely on his uncorroborated confession in violation of the

corpus delicti doctrine. We review the court's ruling on a motion for judgment of acquittal *de novo*, *State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011), but review the court's determination on corpus delicti for an abuse of discretion, *State v. Morris*, 215 Ariz. 324, 333, ¶ 33 (2007).

**¶29** A judgment of acquittal is mandatory "if there is no substantial evidence to support a conviction." Ariz. R. Crim. P. 20(a)(1). Substantial evidence is direct or circumstantial evidence from which a reasonable jury could find each element of an offense proven beyond a reasonable doubt. *West*, 226 Ariz. at 562, ¶ 16. Under the corpus delicti doctrine, a defendant "may not be convicted on his own uncorroborated confessions." *State v. Gillies*, 135 Ariz. 500, 506 (1983). "Only a reasonable inference of the corpus delicti need exist before a confession may be considered." *Id.* Such an inference may be supported by circumstantial evidence, *State v. Hall*, 204 Ariz. 442, 453, ¶ 43 (2003), and it need not corroborate "every physical act constituting an element of the offense," *State v. Morgan*, 204 Ariz. 166, 171-72, ¶¶ 17-21 (App. 2002).

**¶30** To prove sexual assault, the evidence had to show that Navarro intentionally or knowingly engaged in sexual intercourse with Amy without her consent. *See* A.R.S. § 13-1406(A). The statute defines sexual intercourse as "penetration into the penis, vulva or anus by any part of the body or by any object or masturbatory contact with the penis or vulva." A.R.S. § 13-1401(A)(4). Even "the slightest penetration of the vulva is sufficient to complete the offense." *State v. Pollock*, 57 Ariz. 415, 418 (1941). Similarly, to prove sexual abuse, the evidence had to show that Navarro intentionally or knowingly engaged in sexual contact with Amy without her consent. *See* A.R.S. § 13-1404(A). Sexual contact is defined by statute as "any direct or indirect touching, fondling or manipulating of any part of the genitals, anus or female breast by any part of the body or by any object or causing a person to engage in such contact." A.R.S. § 13-1401(A)(3)(a).

**¶31** The State presented ample evidence of Navarro's intent to perpetrate sexual offenses and Amy's lack of consent. Amy's testimony and text messages showed that she did not reciprocate Navarro's feelings for her and feared being alone with him. The store security video showed Navarro waiting for Amy in the warehouse at the back of the store shortly before he attacked her there; he can be seen pacing in the isolated area and fidgeting with his hands in an evident state of nervousness or excitement. The video shows the initial stages of the brutal attack, with Navarro repeatedly striking and choking Amy before dragging her limp body out the back door. Navarro then dragged Amy into a locked room with no

security cameras. This evidence amply corroborates Navarro's confession that he planned the violent sexual offenses he committed.

¶32        The evidence also proved that Navarro's conduct rose to the level of sexual intercourse and sexual contact. Officers testified that they found Amy lying naked and non-responsive on the floor of the electrical room, with her bra torn off her body and her menstrual pad removed. She sustained injuries to her thighs, upper arms, buttocks, anus, and perineum. Navarro's penis appeared purple and swollen shortly after his arrest. Forensic testing revealed that Navarro had Amy's DNA profile on his fingernails, hand, and the tip and shaft of his penis, as well as male DNA on Amy's right breast. The circumstantial evidence corroborates Navarro's admission that he touched Amy's breasts, *see* A.R.S. § 13-1401(A)(3)(a), and engaged in contact with her genitals sufficient to result in penetration, *see* A.R.S. § 13-1401(A)(4). The fact that Navarro incapacitated Amy to such a degree that she could not remember that he penetrated her vulva and touched her breasts does not entitle Navarro to a judgment of acquittal.

¶33        All three sexual offenses are supported by evidence from which a reasonable jury could find them proven beyond a reasonable doubt, *see West*, 226 Ariz. at 562, ¶ 16, and they are "supported by independent evidence or corroborated admissions," *see State v. Jones*, 198 Ariz. 18, 22, ¶ 12 n.6 (App. 2000). We find no error.

### III.    Consecutive Sentences.

¶34        Navarro argues that the superior court violated A.R.S. § 13-116, the double punishment statute, by imposing consecutive sentences for kidnapping and third-degree burglary. Because Navarro failed to raise this issue below, we review solely for fundamental error. *See State v. Escalante*, 245 Ariz. 135, 140, 142, ¶¶ 12, 21 (2018). "Imposition of an illegal sentence constitutes fundamental error." *State v. Thues*, 203 Ariz. 339, 340, ¶ 4 (App. 2002).

¶35        Section 13-116 prohibits the imposition of consecutive sentences for multiple offenses "when the defendant's conduct" constitutes "a single act." *State v. Hampton*, 213 Ariz. 167, 182, ¶ 64 (2006). To determine whether A.R.S. § 13-116 permits consecutive sentences, we apply the three-part test set forth in *State v. Gordon*, 161 Ariz. 308 (1989). First, we "subtract[] from the factual transaction the evidence necessary to convict on the ultimate charge," which is often "the most serious" offense, to determine whether "the remaining evidence satisfies the elements of the other crime." *Id.* at 315. If so, "then consecutive sentences may be permissible under

A.R.S. § 13-116." *Id.* Second, we consider whether "it was factually impossible to commit the ultimate crime without also committing the secondary crime." *Id.* If so, "then the likelihood will increase that the defendant committed a single act under A.R.S. § 13-116." *Id.* Finally, we consider "whether the defendant's conduct in committing the lesser crime caused the victim to suffer an additional risk of harm beyond that inherent in the ultimate crime." *Id.* If so, "then ordinarily the court should find that the defendant committed multiple acts and should receive consecutive sentences." *Id.*

¶36 Here, the kidnapping conviction rested on proof that Navarro knowingly restrained Amy intending to "[i]nflict death, physical injury or a sexual offense on [her], or to otherwise aid in the commission of a felony." *See* A.R.S. § 13-1304(A)(3). The burglary conviction required proof that Navarro entered or remained unlawfully in a non-residential structure "with the intent to commit . . . any felony therein." *See* A.R.S. § 13-1506(A)(1).

¶37 Contrary to Navarro's argument on appeal, the fact that he "was employed" by the store does not negate a finding that he "enter[ed] the premises unlawfully" when he arrived for work on May 8, 2018. An entry onto premises where the defendant is otherwise privileged to be is nonetheless unlawful if the defendant enters with intent to commit a felony. *State v. Van Dyke*, 127 Ariz. 335, 336 (1980) ("[E]ven where the physical entry is objectively legitimate, entry will be illegal if the defendant's subjective intent is to commit a felony."); *see also State v. Allen*, 125 Ariz. 158, 159 (App. 1980) ("The crime of burglary is complete when entrance to a specific structure is gained with the requisite criminal intent."). Here, Navarro admitted during his interview that he formed the intent to sexually assault Amy the night before. The burglary was therefore complete when Navarro entered the store that morning with intent to sexually assault her. The burglary continued as Navarro incapacitated Amy by repeatedly striking and choking her and by slamming her head against the floor until she lost consciousness. *See State v. McGuire*, 131 Ariz. 93, 96 (1981) (finding that remaining unlawfully on premises with intent to commit assault constitutes burglary).

¶38 Because additional acts establishing the kidnapping occurred after Navarro first beat Amy to the point of unconsciousness, different evidence was necessary to establish burglary and kidnapping, and so "consecutive sentences may be permissible under A.R.S. § 13-116." *See Gordon*, 161 Ariz. at 315-16; *see also State v. Cornish*, 192 Ariz. 533, 538, ¶ 19 (App. 1998) (rejecting challenge to consecutive sentences imposed for

burglary and attempted aggravated assault based on defendant's conduct in breaking into victim's home and strangling her; the "burglary" established by the "forced entry" into victim's home was "factually separate" from the "crime of violence" committed after entry).

¶39　　　　The second prong of the *Gordon* test requires us to determine whether "it was factually impossible to commit the ultimate crime without also committing the secondary crime." *Gordon*, 161 Ariz. at 315. Plainly, one can commit kidnapping without committing burglary and vice versa. Under the facts presented here, the jury could have found that Navarro committed burglary by entering the store with the intent to use violence to incapacitate Amy before sexually assaulting her and committed kidnapping by dragging her, unconscious, to a secluded area before committing the sexual assault. Because the offenses rest on separate facts, they do not constitute a "single act" under A.R.S. § 13-116. *See Hampton*, 213 Ariz. at 182, ¶ 64.

¶40　　　　The final prong of the *Gordon* test permits consecutive sentences because the burglary created an "additional risk of harm beyond that inherent" in the kidnapping. *See Gordon*, 161 Ariz. at 315-16. In *Gordon*, the court affirmed the imposition of consecutive sentences for kidnapping and sexual assault because the defendant "not only restrained the victim" and "committed the sexual assault," but he also "held the victim on the floor, hit her with his fists, and strangled her." *Id.* His use of more force than was necessary to commit kidnapping, in other words, warranted the imposition of consecutive sentences. *See id.* For the same reasons, the brutal beating that Navarro administered to Amy before he dragged her to a locked room, choked and kicked her again, and then sexually assaulted her establishes that he inflicted harm beyond that which was inherent in the kidnapping, justifying the imposition of consecutive sentences. The superior court did not err in imposing consecutive sentences for burglary and kidnapping.

**CONCLUSION**

¶41　　　　We affirm.

