975 P.2d 137

The STATE of Arizona, Appellee,

v.

James MARSHALL, Appellant.

No. 2CA–CR97–0010.

Court of Appeals of Arizona, Division 2, Department B.

Sept. 22, 1998.

Review Denied March 25, 1999.

Grant Woods, Attorney General by Paul J. McMurdie and Jon G. Anderson, Phoenix, for Appellee.

Law Office of Carla G. Ryan by Carla G. Ryan, Tucson, for Appellant.

## OPINION

ESPINOSA, Judge.

¶ 1   A jury found appellant James Marshall guilty of attempted first-degree burglary, first-degree burglary, aggravated assault, kidnapping, two counts of sexual abuse, and two counts of sexual assault. The trial court sentenced him to concurrent aggravated prison terms of twenty years on the burglary and aggravated assault counts 'and consecutive, aggravated terms totaling an additional 103 years on the remaining counts. Marshall appealed, arguing that the trial court erred in admitting evidence of deoxyribonucleic acid (DNA) testing, denying his numerous requests for new counsel, consolidating the attempted burglary count with the other charges, failing to dismiss a prospective juror, admitting evidence of prior bad acts, allowing unreliable identification evidence, and imposing aggravated, consecutive sentences.

¶ 2   In a previously filed memorandum decision, we addressed each of those arguments and affirmed Marshall's convictions and sentences. The Arizona Attorney General subsequently requested that we publish the memorandum decision for its discussion of the DNA issues raised by Marshall. Although there is no equivalent to Rule 28(g), Ariz. R. Civ.App. P., 17 B A.R.S., in the Arizona Rules of Criminal Procedure, because we find that only our resolution of the DNA issues meets the standards for publication in Rule 28(b), we publish only that portion of our decision and the pertinent facts.

### Factual And Procedural History

¶ 3   We view the evidence in the light most favorable to upholding the convictions and resolve all reasonable inferences against Marshall. *State v. Atwood*, 171 Ariz. 576, 171 Ariz. 576, 832 P.2d 593 (1992). University of Arizona students T.L. and N.B. shared a second floor apartment near campus. In mid-January 1990, T.L. answered a late night phone call from a man who said he

was with "University Security" and asked for both her and N.B. by name. T.L. handed the phone to N.B., who arranged with the caller to pick up something from lost and found the following day. After N.B. had left for class the next morning, someone knocked on their door. T.L. opened it and a man dressed in navy blue pants, jacket, and baseball cap identified himself as "University Security" and asked for "Jill Armstrong." When T.L. said she did not know anyone by that name, the man asked to use the phone. He made a call and then accused T.L. of lying to him, produced a gun, and ordered her to lie down on her stomach on the kitchen floor. After rummaging through the apartment, he tied T.L.'s hands with the telephone cord, then blindfolded and gagged her and took her to the bedroom, told her he had to "check her for drugs," removed her clothing, and sexually assaulted her.

¶ 4 Marshall was charged with burglary, aggravated assault, kidnapping, two counts of sexual abuse, and two counts of sexual assault. Before trial, the state sought to admit evidence of similar sexual assaults that had occurred in California, Oregon, and Canada. The state also moved to admit evidence of DNA test results the Federal Bureau of Investigation (FBI) lab had performed for T.L.'s assault as well as those in California and Oregon. Because the DNA issues were identical to those pending in another unrelated prosecution, the parties agreed to consolidate the pretrial admissibility hearing with that of another defendant. The trial court conducted a comprehensive *Frye*[1] hearing, totaling twenty-three days of testimony from numerous experts over the course of almost three years,[2] and ultimately allowed evidence of DNA matches and corresponding probability statistics related to the offenses against T.L. as well as the out-of-state assaults. At trial, sexual assault victims from Sacramento and Pasadena, California, and Corvallis, Oregon, testified, describing experiences similar to T.L.'s. FBI lab technicians testified that Marshall's DNA matched that taken from semen samples obtained from each victim and that the probabilities of random matches ranged from one in sixty thousand to one in nine million.[3] The jury found Marshall guilty on all counts.

### Admissibility of DNA Evidence

¶ 5 Marshall contends that the trial court erred in admitting evidence of the DNA matches and corresponding probability statistics, arguing that certain methods the FBI lab used were not accepted by the relevant scientific community at the time the tests were performed.[4] As noted in *State v. Johnson*, 186 Ariz. 329, 330, 922 P.2d 294, 295 (1996), "DNA analysis involves three basic steps: 1) creating the DNA profiles of evidence samples; 2) determining whether profiles of different samples match; and 3) if samples match, articulating the significance of the match, preferably by computing the probability of a random match." We review de novo the trial court's determination that a scientific principle meets the *Frye* requirement of general acceptance in the relevant scientific community. *Id.*

¶ 6 The FBI performed DNA tests using the restricted fragment length polymorphism method (RFLP), a technique that meets *Frye* standards in Arizona. *State v. Bible*, 175 Ariz. 549, 175 Ariz. 549, 858 P.2d 1152 (1993). The final product of RFLP is an x-ray film called an autoradiograph (autorad), which contains several bands and resembles a bar code with the bands represent-

---

1. *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923).

2. The reasons for this lengthy process are detailed in *State v. Spreitz*, 190 Ariz. 129, 945 P.2d 1260 (1997), cert. denied, —— U.S. ——, 118 S.Ct. 1315, 140 L.Ed.2d 479 (1998).

3. The FBI experts also provided lower probabilities under the "modified ceiling method" of product rule computation.

4. Marshall also repeatedly asserts that the FBI lab had not been "certified" or "accredited." We find this contention of no moment because Marshall does not identify any specific accreditation or certification that the FBI lacked. Moreover, there was testimony at the *Frye* hearing that the FBI lab trains other crime lab workers from around the country and that the FBI's method "has been accepted ... and used by many other laboratories."

ing different polymorphic DNA segments.[5] To determine whether two samples match, they are first visually compared. If they visually match, the FBI uses a computer-assisted technique to measure and compare the banding patterns of the samples, calculating a numerical size for each band. A match is declared if each band varies in length no more than plus or minus 2.5 percent from the corresponding band in the other sample, for a total "match window" of five percent.

¶ 7 Marshall first complains that the FBI's match window of "plus or minus five percent" has not been accepted as being valid and reliable, claiming that it is too large. Without attempting to further explicate the complex scientific and mathematical principles involved, *see Johnson* (Martone, J., concurring), we reject this argument for several reasons. First, as he did in the trial court, Marshall misstates the evidence. During the *Frye* hearing, numerous expert witnesses uniformly testified that the FBI's match window is plus or minus 2.5 percent, for a total of five percent, not plus or minus five percent for a total of ten, as Marshall asserts. Second, several courts have rejected similar arguments on the basis that "the issue of the match window clearly goes to weight and not admissibility." *United States v. Yee,* 134 F.R.D. 161, 208 (N.D. Ohio 1991), *aff'd. sub nom, United States v. Bonds,* 12 F.3d 540 (6th Cir.1993). *See also Fishback v. People,* 851 P.2d 884 (Colo.1993); *State v. Vandebogart,* 136 N.H. 365, 616 A.2d 483 (N.H.1992); *State v. Anderson,* 118 N.M.

284, 881 P.2d 29 (N.M. 1994); *State v. Ford,* 301 S.C. 485, 392 S.E.2d 781 (S.C.1990); *State v. Jones,* 130 Wash.2d 302, 922 P.2d 806 (Wash.1996). Third, the state presented expert testimony that the FBI's match window was generally accepted in the scientific community, and numerous courts, including our supreme court, have found DNA tests performed by the FBI admissible under the *Frye* test. *State v. Hummert,* 188 Ariz. 119, 933 P.2d 1187 (1997); *see also Yee*[6]; *Harmon v. State,* 908 P.2d 434 (Alaska App. 1995); *People v. Axell,* 235 Cal.App.3d 836, 1 Cal.Rptr.2d 411 (App.1991); *United States v. Porter,* 618 A.2d 629 (D.C. App.1992); *State v. Montalbo,* 73 Haw. 130, 828 P.2d 1274 (Haw. 1992); *State v. Alt,* 504 N.W.2d 38 (Minn.App.1993); *Anderson; State v. Copeland,* 130 Wash.2d 244, 922 P.2d 1304 (Wash. 1996). Thus, the trial court properly admitted the DNA match results.

¶ 8 Citing *Bible* generally and some pre-*Bible* scientific articles, Marshall also contends that the "population probabilities, as determined by the FBI's fixed bin product rule calculation, are not accepted by the relevant scientific community as reliable and valid."[7] In a less than cogent argument, and relying on his previous untenable claim, Marshall complains that "[m]any of the FBI's fixed bins were not larger than its measurement error and, as a result, could not be validly and reliably used as query windows for the database." He further asserts that "at the time of testing the NRC [National Research Council[8]] had not endorsed the

---

**5.** The measured polymorphic gene segments are called "variable number tandem repeats" (VNTRs) and typically consist of varying lengths of repeating sequences of base pairs whose length is determined by the number of VNTRs. "Although all individuals have the same sequence of nucleotides at these VNTR locations, what differs from person to person is the number of times this sequence repeats itself. Thus, differences in DNA are detected by counting the number of times a particular sequence repeats at that VNTR." *State v. Anderson,* 118 N.M. 284, 881 P.2d 29, 33 (N.M.1994); *see also State v. Bible,* 175 Ariz. 549, 858 P.2d 1152 (1993).

**6.** We note that *Yee* was decided prior to *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), in which the United States Supreme Court held that *Frye* had been superseded by the Federal Rules

of Evidence, a position which has expressly not been adopted by our supreme court. *State v. Tankersley,* 191 Ariz. 359, 956 P.2d 486 (1998); *State v. Bible,* 175 Ariz. 549, 858 P.2d 1152 (1993).

**7.** For comparison purposes, DNA bands are sorted into ranges of sizes called "bins." Fixed bins "compartmentalize the entire spectrum of VNTR base-pair sizes likely to appear as bands on an autorad ... [and show] not only each bin's range of sizes and number of bands, but also each bin's frequency." *People v. Venegas,* 18 Cal.4th 47, 74 Cal.Rptr.2d 262, 954 P.2d 525, 536 (Cal.1998).

**8.** The National Research Council is comprised of members from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine, and its scientific consensus is accorded weight by

FBI lab's techniques" and had criticized the FBI's match window and use of the product rule. As noted above,however, the FBI's total match window was five percent. FBI Special Agent Harold Deadman testified that the smallest of its fixed bins was six percent with an average bin size of about ten percent, thus contradicting Marshall's underlying premise.

¶ 9 In addition, a brief review of recent Arizona decisions addressing DNA statistical evidence undercuts Marshall's arguments. In *Bible*, our supreme court found probability statistics calculated using the product rule not generally accepted in the relevant scientific community and therefore inadmissible, but limited its holding to statistics produced by the commercial lab that had performed the DNA tests, primarily due to problems with its database. Subsequently, in *Johnson*, the court approved this court's holding that probability statistics calculated with the modified ceiling method, essentially a restricted version of the product rule, met the *Frye* general acceptance standard, based in part on the NRC's endorsement of the method in its 1992 report. The court noted that the NRC had concluded that "alternative methods [to the modified ceiling method], primarily the [unrestricted] product rule, are now appropriate." 186 Ariz. at 335, 922 P.2d at 300. A year later in Hummert, the court again had occasion to discuss the product rule and provided a significant clarification of *Bible's* prohibition of statistical evidence derived under that method: "Arguably, with a database that meets *Frye* requirements, the product rule may be accepted as effective for calculating the probability of a random match." 188 Ariz. at 123, 933 P.2d at 1191.

¶ 10 We further note that the NRC issued an updated report in 1996, after the decisions in *Bible* and *Johnson*, withdrawing its earlier suggestion that the product rule be modified and restricted for forensic purposes. See National Research Council, Committee on DNA Forensic Science, An Update, The Evaluation of Forensic DNA Evidence (Na-

tional Academy Press 1996). Endorsement by the NRC "is strong evidence of general acceptance within the relevant scientific community." *Johnson*, 186 Ariz. at 334, 922 P.2d at 299. Moreover, a majority of recent cases from other jurisdictions have approved the product rule's use. *See, e.g., Bonds; Lindsey v. People*, 892 P.2d 281 (Colo. 1995); *State v. Faught*, 127 Idaho 873, 908 P.2d 566 (Idaho 1995); *People v. Dalcollo*, 282 Ill. App.3d 944, 218 Ill.Dec. 435, 669 N.E.2d 378 (Ill.App.1996); *Armstead v. Maryland*, 342 Md. 38, 673 A.2d 221 (Md.1996); *Commonwealth v. Rosier*, 425 Mass. 807, 685 N.E.2d 739 (Mass.1997); *People v. Chandler*, 211 Mich.App. 604, 536 N.W.2d 799 (Mich.App. 1995); *State v. Kinder*, 942 S.W.2d 313 (Mo. 1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 149, 139 L.Ed.2d 95 (1997); *State v. Weeks*, 270 Mont. 63, 891 P.2d 477 (Mont.1995); *State v. Freeman*, 571 N.W.2d 276 (Neb. 1997); *People v. Watson*, 167 Misc.2d 418, 634 N.Y.S.2d 935 (Sup.Ct.1995); *Copeland.*

¶ 11 Marshall suggests, however, that because much of the validation and general scientific acceptance of the FBI's product rule protocol has been recognized in cases decided after the testing and *Frye* hearing in this case, these more recent authorities should be deemed "not relevant." We cannot agree. As we noted in *State v. Johnson*, 183 Ariz. 623, 630 n. 8, 905 P.2d 1002, 1009 n. 8 (App.1995), "[b]ecause 'neither logic nor authority supports confining ourselves to a snapshot, rather than viewing the motion picture, of technological advancement,' [quoting *Bible*,] 175 Ariz. at 587, 858 P.2d at 1190, we survey all information available and consider cases and scientific literature published after trial." Moreover, the state presented expert testimony at the *Frye* hearing that the FBI's method of calculating probability statistics had at that time been generally accepted in the relevant scientific community. Reputable scientific sources bear this out.[9] Consequently, we find no basis for disturbing the trial court's admis-

---

courts. *See State v. Johnson*, 186 Ariz. 329, 922 P.2d 294 (1996).

9. See the scientific articles cited in *State v. Johnson*, 186 Ariz. 329, 335, 922 P.2d 294, 300 (1996), and *Armstead v. State*, 342 Md. 38, 673 A.2d 221, 238 (Md.1996).

sion of either the DNA test results or the corresponding probability statistics.

¶ 12   Affirmed.

JOHN PELANDER, Presiding Judge, and JOSEPH W. HOWARD, Judge, concur.